## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARON BAKER-BEY, | : | CIVIL CASE |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| DELTA SIGMA THETA SORORITY, | : | |
| INC., et al., | : | |
| Defendants. | : | NO. 12-1364 |

### MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

Baylson, J.                                                                April 22, 2013

### I.      Introduction

On March 16, 2012, Plaintiff Sharon Baker-Bey filed her Complaint (ECF 1) claiming

common law defamation, breach of fiduciary duty, and negligence against Defendant Delta

Sigma Theta Sorority, Inc. ("Delta") and fourteen Delta officials, including the National

President (collectively, "Defendants").  On October 10, 2012, Defendants filed a Motion for

Summary Judgment (the "Motion") (ECF 16).  On November 13, 2012, Plaintiff filed her

Response (ECF17).  Defendants filed a Reply (ECF 21) on December 5, 2012.  Plaintiff filed a

Sur-Response (ECF 22) on February 12, 2013, to which Defendants did not reply.[1]

For the reasons below, Defendants' Motion is GRANTED.

### II.     Undisputed Facts[2]

Delta is a sorority that was incorporated in 1913 under the laws of the District of

Columbia.  (Defs.' Statement of Undisputed Facts ("Def.'s SUF") ¶ 1.)  Plaintiff became a

---

[1] Defendants did not file their Statement of Undisputed Facts (ECF 20) until November 26, 2012.  Plaintiff did not file her Statement of Undisputed Facts (ECF 24) until March 14, 2013, after the Court ordered her to do so (ECF 23.)

[2] The material facts in this case are entirely undisputed.  Plaintiff admitted all but four of the twenty-one paragraphs in Defendants Statement of Undisputed Facts.  The facts Plaintiff denies are immaterial to the disposition of Defendants' Motion.

member of Delta in 1978 and is now an alumnae member.  (Id. ¶ 2.)  In accordance with its rules

and regulations, Delta suspended Plaintiff's membership and fined her $500 after determining

that she had violated the sorority's anti-hazing policy.  (Id. ¶ 15; Def.'s Mot., Ex. 15.)

According to Delta's Bylaws, members "may be placed on probation, suspended . . .

expelled from the Sorority, [or] fined" for violating the sorority's "rules or regulations."

(Bylaws, art. XII, sec. 2.A., Defs.' Mot., Ex. 14.)  Delta maintains a zero-tolerance policy

regarding all matters related to hazing of prospective members.  (Defs.' SUF ¶3.)  In keeping

with this policy, Delta:

1. Prohibits alumnae members from participating in its college
   membership intake process, unless they have been trained and
   specifically selected to do so (Id. ¶ 4.);

2. Prohibits members from "visit[ing] collegiate or alumnae
   chapters and participat[ing] in underground or illegal
   Membership Intake" (Bylaws art. XII, sec. 2.B.); and

3. Maintains a detailed list of "Improper or Unacceptable
   Conduct," section 5.A. of which prohibits "Pre-initiation or
   illegal Membership Intake and/or underground activities.
   **Underground** activities is [sic] anything in addition to or
   contrary to approved activities."  (Code of Conduct, Defs.'
   Mot., Ex. 10 (emphasis in the original).)

The list of Improper or Unacceptable Conduct also sets forth sanctions and fines for violations –

a first violation of the prohibition on underground activities carries a three-year suspension and a

$500 fine.  (Id.)

In the spring of 2009, Delta's chapter at Pennsylvania State University's University Park

campus ("Penn State") was initiating new members.  (Defs.' SUF ¶¶ 5, 7.)  On April 11, 2009,

the Chapter Primary Advisor discovered Plaintiff eavesdropping on a private ceremony for new

Delta initiates.  (Id. ¶ 8.)  Plaintiff expressed a desire to speak with the new initiates, and the

Advisor informed her that doing so is prohibited by Delta's rules and regulations.  (Id.)  The Advisor asked Plaintiff to leave, which she did.  (Id.)

The Advisor subsequently reported the incident to Delta's Regional Director for the Eastern Region.  (Id. ¶ 9.)  The Regional Director issued a letter to Plaintiff notifying her that, pending the completion of an investigation, she must cease and desist from all activities related to her then alleged violation of "5A. Pre-initiation or illegal Membership Intake and/or underground activities."  (Defs.' Mot., Ex. 8; Defs.' SUF ¶ 10.)  Delta's investigation, which included interviewing Plaintiff, revealed that Plaintiff admitted both to her presence at Penn State and that she was seeking to make contact with women participating in Delta's membership intake process, though Plaintiff maintained that she had done nothing wrong.  (Defs.' SUF ¶ 11; Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶ 11.)  During the investigation, Plaintiff produced emails establishing that she had been in contact with a prospective member of Delta regarding the membership intake process.  (Defs.' SUF ¶13; Pl.'s SUF ¶ 13.)  Plaintiff's emails also referenced her "family," and stated that she "pray[s]" that the prospective member will "join [her] chapter and sorority and hopefully , [sic] my family!"  (Defs.' Mot., Ex. 9.)  One of the purposes of a "family" is to provide unapproved assistance to potential members during the intake process.  (Id., Ex. 4.)

The Regional Director concluded that Plaintiff had violated section 5.A. of Delta's list of Improper or Unacceptable Conduct.  (Id., Ex. 9.)  Delta's National President approved the Regional Director's determination.  (Id., Ex. 11.)  Delta then suspended and fined Plaintiff, and posted these sanctions on its website as part of its list of suspended members.  (Defs.' SUF ¶ 16.)  The posting included Plaintiff's name, the chapter to which she belonged, the length of her suspension, and the amount of her fine.  (Defs.' Mot., Ex. 15.)  Plaintiff learned of her

3

suspension from a fellow member who saw Plaintiff's name of the suspended list.  (Pl.'s SUF ¶ 17.)[3]

On August 25, 2009, Plaintiff sent an email to Delta, carbon copying the National President, expressing frustration and disappointment with Delta's disciplinary process.  (Defs.' Mot., Ex. 19.)  In addition to being upset about the manner in which she learned of the disciplinary action taken against her, Plaintiff alleged denial of due process, defamation, breach of contract, negligence, and discrimination.

Plaintiff then availed herself of Delta's disciplinary action appeals process.  (Defs.' SUF ¶ 20.)  The appeals process consists of three levels.  (Chapter Mgmt. Handbook:  Appeals Process ("Appeals Process"), Defs.' Mot., Ex. 16.)  Delta received Plaintiff's first-level appeal in September 2009, and Delta affirmed its initial decision in October 2009.  (Defs.' Mot., Ex. 17.)  Plaintiff then appealed to the second level in December 2009.  (Id., Ex. 18.)

On December 30, 2009, before disposition of her second-level appeal, Plaintiff sent an email to Delta's "Member Relations Specialist:  Internal Policies and Procedures" requesting that her second-level Appeal Disposition Form contain specific information about the conduct for which she had been disciplined, including the names of the people she allegedly hazed, and the places and dates of her underground activities.  (Pl.'s Sur-Resp., Ex. A.)  Plaintiff's email was forwarded to the National First Vice President, who responded to Plaintiff on January 6, 2010, "assur[ing] [Plaintiff] that the appeal process . . . will be adhered to, as per the Sorority's guidelines."  (Id.)

---

[3] Defendants contend that they notified Plaintiff of her suspension.  (Defs.' SUF ¶ 17.)  However, the evidence they cite does not support their contention.  The Court adopts Plaintiff's account of how she learned of her suspension, because it is immaterial to the disposition of Defendants' Motion.

Sometime in January 2010, Delta denied Plaintiff's second-level appeal, affirming its decision to discipline her.  (Id., Ex. 18; Pl.'s Sur-Resp., Ex. A.)  The exact date of the disposition of Plaintiff's second-level appeal is not clear.  Delta's Appeal Disposition Form shows a "Date Decision Was Forwarded" of January 20, 2010, but Plaintiff stated in an email to Delta that she received a "form Appeal Disposition letter" on February 25, 2010, which was dated January 7, 2010.  (Defs.' Mot., Ex. 18; Pl.'s Sur-Resp., Ex. A.)

On March 10, 2010, Plaintiff emailed the National President, forwarding to her Plaintiff's December 30, 2009 email regarding the information she wanted Delta to include in her second-level Appeal Disposition Form, as well as the National First Vice President's January 6, 2010 response to that email.  (Pl.'s Sur-Resp., Ex. A.)  In addition to forwarding these prior emails, Plaintiff wrote a message to the National President, which began "[t]his is a request for your oversight of my situation" and reminded the National President of a July 2009 card in which Plaintiff "ask[ed] for [her] help."  Plaintiff went on to complain that her first- and second-level appeals had not been fair.  Among other things, she asserted that Delta had not followed its "guidelines" by failing to provide her with "an explanation at the fact finding level" and "the facts regarding the allegations and findings."  The message concluded with a threat of legal action if Delta did not provide a "meaningful" response by April 23, 2010.  (emphasis in the original).

The National President responded to Plaintiff's March 10, 2010 email the same day.  (Id., Ex. B.)  The National President informed Plaintiff that she had been "attempting to obtain any additional information that I could for you to be sure you had all the facts concerning your appeal and the process.  However, since you have engaged the services of an attorney, I need to forward this to the appropriate persons(s)."

5

There is no record of Plaintiff replying to the National President's email, or of any other subsequent communication between Plaintiff and Delta.  Plaintiff did not request a third-level appeal.[4]  (Defs.' SUF ¶ 21.)

## III.   Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative."  Anderson, 477 U.S. at 249 (citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

---

[4] Plaintiff contends that her March 10, 2010 email to the National President was a request for a third-level appeal, and the National President's response was a denial of that request.  For the reasons set forth in Section IV.B.4, infra, Plaintiff's proposed interpretation of these emails is unreasonable.

## IV.    Discussion

Plaintiff claims that Defendants are liable to her for breach of fiduciary duty, negligence, and defamation, because they improperly disciplined her.  Plaintiff's breach of fiduciary duty claim is really a request that the Court interfere with Delta's decision to discipline her.[5]  For the reasons below, the Court finds no basis for such interference.  Furthermore, having determined that the decision should stand, the Court finds that Plaintiff's claims for negligence and defamation must fail, because she cannot point to any duty that Defendants breached, and Delta's publication of her discipline was irrefutably true.

### A.    Applicable Law

Because the Court sits in Pennsylvania, it must apply Pennsylvania's conflict of law principles.  Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 179 n.10 (3d Cir. 2005).  Regarding Plaintiff's breach of fiduciary duty claim, Pennsylvania has a statute adopting the "internal affairs doctrine," which dictates "that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation."  Id. (citing 15 Pa. Cons. Stat. § 4145(a); CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 89-93 (1987); First Nat'l City Bank v. Banco Para El Comercio, 462 U.S. 611, 621 (1983); In re Estate of Hall, 731 A.2d 617, 622 (Pa. Super. Ct. 1999)).  Accordingly, the Court will apply District of Columbia law to

---

[5] For reasons explained in below, District of Columbia law applies to Plaintiff's breach of fiduciary duty claim.  In order to prove her claim under District of Columbia law, Plaintiff must establish, among other things, "a breach of the duties associated with the fiduciary relationship."  Armenian Genocide Museum and Memorial, Inc. v. Cafesjian Family Found. Inc., 607 F. Supp. 2d 185, 190-91 (D.D.C. 2009) (citing Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008)).  Plaintiff claims that Defendants breached their fiduciary duty failing to abide by Delta's disciplinary procedures.  (Compl. ¶¶ 29-30 ("Defendants . . . had a duty to . . . abide by [Delta's] Constitution and Bylaw and other governing documents . . . .  [D]efendants breached [this] duty . . . .").)  Therefore, her breach of fiduciary duty claim is, at bottom, a request for judicial oversight of those procedures and their application to her case.

Plaintiff's breach of fiduciary duty claim.  Id. (affirming application of the "internal affairs

doctrine" to a breach of fiduciary duty claim).

      The parties have not pointed to, and the Court is not aware of, any "relevant differences

between" Pennsylvania law and District of Columbia law regarding defamation and negligence

"that would affect the disposition of the litigation."  Taylor v. Mooney Aircraft Corp., 265 F.

App'x 87, 90 (3d Cir. 2008).  Accordingly, the Court will "'refer to [Pennsylvania and District of

Columbia] law interchangeably'" when discussing Plaintiff's defamation and negligence claims.

Id. (quoting Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229 (3d Cir. 2007)).

### B.    Plaintiff Provided Insufficient Evidence to Warrant Judicial Interference with Delta's Decision to Discipline Her.

      Pursuant to established District of Columbia law, "'courts ordinarily will not interfere

with the management and internal affairs of a [sorority].'"  Jolevare v. Alpha Kappa Alpha

Sorority, Inc., 521 F. Supp. 2d 1, 9 (D.D.C. 2007) (quoting Levant v. Whitley, 755 A.2d 1036,

1043 (D.C. 2000) (quoting Avin v. Verta, 106 A.2d 145, 147 (D.C. 1954) and citing NAACP v.

Golding, 679 A.2d 554, 558 (Md. 1996) ("as a general rule, courts will not interfere in the

internal affairs of a voluntary membership organization"))); accord Daley v. Alpha Kappa Alpha

Sorority, Inc., 26 A.3d 723, 730 (D.C. 2011).  However, the District of Columbia Court of

Appeals has suggested that such interference may be appropriate if the sorority "failed to follow

its own rules,"  Daley, 26 A.3d at 730-31, or to protect sorority members from fundamentally

unfair procedures and officials acting arbitrarily, fraudulently, or in bad faith, Levant, 755 A.2d

at 1043 n.11, 1044-46.  "'[W]hen a party comes into court for relief [in such situations] it is

incumbent upon [her] to show the existence of facts to justify the interference of the court.'"

Jolevare, 521 F. Supp. 2d at 9 (alterations in the original) (quoting United States ex rel. De

Yturbide v. Metro. Club, No. 652, 1897 WL 17732, at *13 (D.C. June 9, 1897)); accord Blodgett

v. Univ. Club, 930 A.2d 210, 230 (D.C. 2007).

      Plaintiff contends that judicial interference is warranted in this case because:

    1.  Delta's definition of prohibited membership intake activities is too vague to give fair notice of what constitutes prohibited conduct;

    2.  Delta's determination that her conduct was sanctionable is so clearly erroneous that it evinces a failure to properly carry out the required investigation;

    3.  The disciplinary process is inherently fundamentally unfair; and

    4.  Delta improperly prevented her from participating fully in the appeals process.

While Plaintiff's complaints, if true, may have warranted this Court's interference in Delta's

internal affairs, none of them withstand scrutiny.

      **1.    Delta's Definition of Prohibited Membership Intake Activities Is clear and Unambiguous.**

      Delta's Code of Conduct defines prohibited membership intake activities as "anything

that is in addition to or contrary to approved activities."  (Defs.' Mot., Ex. 10 (emphasis added)).

While this definition is broad, it is not vague:  Delta prohibits its members from any and all

interaction with prospective members regarding intake that has not been approved by the

sorority.

      Plaintiff also argues that Delta failed to provide a clear definition of what constitutes

"approved" activities.  Absent a showing that Delta promulgated a relevant, ambiguous

description of what constitutes an approved intake activity, there can be no confusion as to whether Plaintiff's conduct was "approved." Plaintiff has made no such showing.[6]

2.     **Delta's Determination that Plaintiff Violated Its Prohibition on Unapproved Membership Intake Conduct Was Not Erroneous.**

Plaintiff argues that her conduct is not sanctionable because Delta's Bylaws prohibit only "visit[ing] collegiate or alumnae chapters and participat[ing] in underground or illegal Membership Intake." (Bylaws, art. XII, sec. 2.B. (emphasis added).) According to Plaintiff, this means that Delta may sanction her only if she actually engaged in prohibited conduct. (Pl.'s Sur-Resp. at 4.) This reading of Delta's Bylaws would make Plaintiff's conduct at Penn State innocent, because she never took part in the intake activity on which she was eavesdropping, and other Delta members prevented her from making any contact whatsoever with prospective members. (Id.)

Plaintiff also maintains that the emails she provided to Delta during its investigation exonerate her, because they establish that she was unfamiliar with the particulars of Delta's then ongoing intake process. According to Plaintiff, this proves that she was not involved in intake activities of any kind. (Id.)

Plaintiff's position ignores the provisions of Delta's Bylaws and Code of Conduct that expressly prohibit members from having any unapproved contact with prospective members

_____

[6] In her Sur-Response, Plaintiff asserts, without any supporting evidence, that because of her former role as co-chairperson of the Scholarship Committee of Delta's Philadelphia Alumnae Chapter, she was "assigned several scholar students to mentor," one of whom was the prospective member Plaintiff had emailed regarding the membership intake process. (Pl.'s Sur-Resp. at 1.) Even assuming these assertions are true, they could not create a relevant, ambiguous description of what constitutes an approved intake activity. Whatever it means for Plaintiff to have been "assigned . . . students to mentor," she never argued that her status as a mentor included responsibilities related to Delta's intake process.

regarding the intake process.[7]  Plaintiff also appears to fundamentally misunderstand the reason

Delta sanctioned her.  Delta did not sanction her for participating in the intake activities at Penn

State, which were apparently approved activities,[8] or for her participation in any similar

activities.  Rather, Delta sanctioned Plaintiff because of the emails she produced,[9] which:

> 1. Established that she had made unapproved contact with a prospective member about Delta's intake process; and
>
> 2. Referenced her participation in a "family" – one of the purposes of a "family" is to provide unapproved assistance to prospective members.[10]

---

[7] The Bylaws permit sanctions for "violation of [Delta's] rules or regulations," and the Code of Conduct expressly states that it is a "[m]embership [i]ntake [v]iolation[]" for "any" member to engage in "anything" that is not a Delta-approved activity.  (Bylaws, art. XII, sec. 2.A.1.; Defs.' Mot., Ex. 10.)

[8] On the day that Plaintiff was at Penn State, Delta was conducting "Jewel Day activities."  (Incident Summary Report, Background, para. 2, Defs.' Mot., Ex. 4.)

[9] Delta's "Incident Summary Report," which reviewed the investigation of Plaintiff's conduct, concluded that Plaintiff should be sanctioned because her emails to a prospective member violated "the sorority's code of conduct."  (Defs.' Mot., Ex. 4.)  The report did discuss Plaintiff's conduct at Penn State, but the "SUMMARY/CONCLUSIONS" section does not refer to the Penn State conduct as a basis for Plaintiff's Code of Conduct violation, it refers only to Plaintiff's emails.  (Id.)

Even assuming that Delta sanctioned Plaintiff, in part, for her activities at Penn State, the Court could not deem that determination erroneous.  Plaintiff admitted that she had been attempting to engage in prohibited contact with prospective members – though Plaintiff believed that such conduct was innocent.  It would be unreasonable for the Court to conclude that because Delta thwarted Plaintiff's attempted transgression, there was no basis for disciplining her.

[10] In Plaintiff's Response and Sur-Response, she argued that "Defendants erroneously relied on their own interpretation of Plaintiff's emails when conducting their investigation." (Pl.'s Resp. at 4; Pl.'s Sur-Resp. at 4.)  However, Plaintiff never specifically denied having participated in a "family," despite Defendants' arguing in their Motion that Plaintiff's use of the word "family" and related language is "typical[]" of "members participating in underground activities."  (Defs.' Mot. at 7.)  Even if Delta's understanding of Plaintiff's emails is incorrect on this point, Plaintiff's unapproved contact with a prospective member regarding Delta's intake process would still amount to a violation of Delta's Code of Conduct.

11

### 3.      Delta's Disciplinary Process Is Not Inherently Unfair.

It is well established that "'[t]he common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial, nor adherence to a single mode of process.'"  Jolevare, 521 F. Supp. 2d at 10-11 (quoting Blodgett, 930 A.2d at 230).  All that is required is "'one of a variety of procedures which afford a fair opportunity for [an individual] to present [her] position.'"  Id. at 11 (alterations in the original) (quoting Blodgett, 930 A.2d at 230).  Some courts examine whether the procedures are "'substantial[ly] fair[].' . . . '[providing] at least rudimentary procedural protections, such as notice and an opportunity to be heard.'"  Id. (quoting Levant, 755 A.2d at 1045-46 and Golding, 679 A.2d at 561); accord Blodgett, 930 A.2d at 227.  Substantial fairness does not, however, require "the same type of process afforded by our civil and criminal justice systems."  Jolevare, 521 F. Supp. 2d at 11 (citing NCAA v. Tarkanian, 488 U.S. 179, 191 (1988)); accord Blodgett, 930 A.2d at 227.

Delta disciplines its members only after conducting an investigation according to its Chapter Management Handbook, Investigative Procedure for Disciplinary Actions.[11]  (Defs.' Mot., Ex. 13.)  Members facing disciplinary action must receive written charges setting forth material information about the allegations against them, such as dates, times, names, and places. (Id. ¶ 2.)  Investigations proceed according to the "standardized Investigative Procedure and Profile," (Id. ¶ 1) which requires, among other things, a statement of the alleged violative

---

[11]  In her Complaint, Plaintiff made the general allegation that Delta "applied faulty investigative procedures . . . and failed to comply with [its] policies and/or requirements throughout the entire investigative and disciplinary process as applied to Plaintiff."  (Id. ¶ 26.) She also alleged that she requested, but did not receive, "copies of . . . forms detailing [her] alleged violation," including "a copy of all allegations and the date . . . [Delta] received the reported allegations," as well as "copies of the forms [Delta's] investigators made [her] complete that related to the matter."  (Id. ¶¶ 12-13.)  However, neither Plaintiff's Response nor Sur-Response argued that Delta's decision to discipline her should be rejected because Delta failed to abide by its investigation procedures.

conduct, identification of the sources of the complaint about the conduct, statements from the individuals under investigation, and any other relevant statements and documents. Based on the procedures as applied to Plaintiff, Delta provides members not only with an opportunity to make statements, but also to submit other evidence.

If members are dissatisfied with Delta's decision to discipline them, they may avail themselves of a three-level appeals process. At the first two levels, appellants are not entitled to be heard.[12] However, at the third level, the five-member appeals panel "shall . . . interview the appellant, witnesses and others whose testimony they feel is vital to the case." (Appeals Process, Procedures, Level III, para. A. (emphasis added).) The final decision is made by "vote or resolution by the Grand Chapter," (Id. paras. A., B.) which involves hundreds of members. (Walker Decl. ¶ 10, Dec. 5, 2012, Defs.' Reply, Ex. 1.)

Plaintiff contends that the process is inherently unfair because appellants have no opportunity to be heard during the appeals process, and the National President can unfairly influence the outcome of appeals, because she has the power to appoint the hearing officers for the second- and third-level appeals and occupies a position of general influence within Delta.

Plaintiff's first contention is simply wrong. While appellants are not entitled to be heard at the first two levels of appeal, they must be interviewed again at the third level.

Plaintiff's second contention is equally unavailing, though for a different reason. Plaintiff has provided no authority for the proposition that a private organization's disciplinary process must eliminate even the perception of unfairness, and the Court can divine no justification for imposing a standard of impartiality that is analogous to the appearance of bias standard for the recusal of federal judges. See Blodgett, 930 A.2d at 228 ("Members of a

---

[12] Under certain circumstances, appellants may request in-person hearings for their second-level appeals and have fellow members act as representatives. (Id.)

voluntary association cannot always expect to find, and more importantly are not entitled to, the type of neutral and disinterested arbiters provided for in judicial proceedings."); Karim-Panahi v. U.S. Congress, Senate and House of Representatives, 105 F. App'x 270 (D.C. Cir. 2004) ("a judge must recuse herself only if there 'is a showing of an appearance of bias or prejudice sufficient to permit the average citizen reasonably to question a judge's impartiality'" (emphasis added) (quoting United States v. Heldt, 668 F.2d 1238, 1271 (D.C. Cir. 1981)).[13]

Delta's disciplinary procedures provide members with substantial procedural safeguards, including notice of the charges against them, standardized investigations according to written procedures, more than one opportunity to present their cases, and the right to organization-wide review of their cases. Accordingly, Plaintiff has failed to show deficiencies in Delta's procedures that warrant judicial interference. See Jolevare, 521 F. Supp. 2d at 11 (suggesting approval of a similar disciplinary process); Blodgett, 930 A.2d at 230 ("[W]e will not attempt to fix a rigid procedure that must invariably be observed. In some cases, for example, it may be adequate to provide an opportunity for a mere written response; in other circumstances, a personal appearance by the adversely affected individual and a more extensive hearing [may be] required." (second alteration in the original; quotations and citations omitted)).

---

[13] Absent such a principle, Plaintiff must provide more than her uncorroborated conjecture that the National President skewed the appeals process against her because of her August 25, 2009 email complaining about Delta's disciplinary process and criticizing, among others, the National President. See Blodgett, 930 A.2d at 227-29; Waris v. HCR Manor Care, Civil Action No. 07-3344, 2009 WL 330990, at *1 n.2 (E.D. Pa. Feb. 10, 2009) (Baylson, J.), aff'd, 365 F. App'x 402 (3d Cir. 2010) ("'courts do not weigh evidence or determine credibility questions at the summary judgment stage . . . .' [Nevertheless a] party opposing summary judgment must do more than just 'rest upon mere allegations, general denials, or . . . vague statements'" (quoting Hill v. City of Scranton, 411 F.3d 118, 131 (3d Cir.2006); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992); and Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002) ("When opposing a motion for summary judgment, the party bearing the burden of persuasion in the litigation is obligated to identify those facts of record which would contradict the facts identified by the movant." (quotation omitted)))).

### 4.    Delta Did Not Refuse Plaintiff Her Third-Level Appeal.[14]

Plaintiff contends that Delta refused her a third-level appeal because she retained counsel. Plaintiff's contention is wholly unsupported by the record.  To the contrary, the record establishes that Plaintiff never requested a third-level appeal and, therefore, voluntarily relinquished that right.

Plaintiff relies on three emails to establish that she requested and was denied a third-level appeal.  The first was Plaintiff's August 25, 2009 to Delta, carbon copying the National President.  (Defs.' Mot., Ex. 19.)  Delta received Plaintiff's first-level appeal in September 2009, and the Appeal Disposition Form shows a "Date Decision Was Forwarded" of October 31, 2009. (Id., Ex. 17.)  Therefore, Plaintiff's email in August 2009 cannot have been a request for a third-level appeal.

Plaintiff also claims that she requested a third-level appeal in her March 10, 2010 email to the National President, and that the National President's response denied her request.  (Pl.'s Sur-Resp., Exs. A, B.)  However, neither email explicitly references a third-level appeal. Furthermore, Plaintiff's email cannot reasonably be read as a request for a third-level appeal, and the National President's response cannot reasonably be read as a denial of such a request.

The subject line of Plaintiff's March 10, 2010 email to the National President was "FWD: APPEAL - Level 2 Request for Review."  (Id., Ex. A.)  The body of the email began with Plaintiff "request[ing] . . . your [the National President's] oversight or review of my situation" and refers the National President to a "card" Plaintiff had sent her "in July 2009, asking for [her]

---

[14] In her Complaint, Plaintiff also alleged that she was never "provide[d] . . . written reasons for [her disciplinary action], in violation of Article XII Section 5 of Delta['s] . . . Constitution and Bylaws."  (Compl. ¶ 27.)  However, Plaintiff did not argue that this failure was material, or even relevant, to the outcome of her appeals, and the Court will not treat what apparently amounts to a technical mistake on Delta's part as a basis for judicial interference in its internal disciplinary process.

help."  Plaintiff also reminded the National President that her card had expressed "hope[ that] the beauracracy [sic] had not overwhelmed the Grand Chapter of our Sorority, and that you would have time for the serious individual matters of the membership."

Plaintiff's request for the National President's "oversight or review" cannot reasonably be read as a request for a third-level appeal, because the National President does not oversee or review third-level appeals.  Rather, the National President has to wait until "the next National Convention," at which time she appoints five hearing officers to manage the appeal.  (Appeals Process, Procedures, Level III, para. A.)  The final decision on Plaintiff's third-level appeal would have been made by "vote or resolution by the Grand Chapter," (id. para. B.) which involves hundreds of members.  (Walker Decl. ¶ 10.)

Additionally, Plaintiff's July 2009 card was sent before Delta even finalized its decision to discipline her,[15] and, therefore, it would be unreasonable to read Plaintiff's renewal of that entreaty as a request for a third-level appeal.

Neither can anything in the balance of Plaintiff's March 10, 2010 email reasonably be read as a request for a third-level appeal, because Plaintiff merely:

1. Elaborated her reasons for believing that her first- and second-level appeals were unfair;

2. Threatened to refer the matter to an attorney unless she received "meaningful communication from the Sorority by April 23, 2010," which "indicat[es] a willingness to, indeed 'adhere to the sorority's guidelines' and to show some level of sisterhood and fairness[] in this matter" (emphasis in the original); and

3. Provided the National President with the email chain from late December 2009 and early January 2010 regarding Plaintiff's

---

[15] Delta's Disciplinary Action Form for Plaintiff shows that the National President did not approve Plaintiff's suspension until August 8, 2009.  (Defs.' Mot., Ex. 11.)

> request that Delta include certain information in her second-
> level Appeal Disposition Form.

The "meaningful" response Plaintiff demanded by April 23, 2010 must have been something

other than a third-level appeal, because the date of that appeal would have been dictated by the

date of Delta's next National Convention.  (Appeals Process, Procedures, Level III.)

Regarding the National President's response, it does not even intimate that she

understood Plaintiff to be requesting a third-level appeal.  To the contrary, she responded as if

Plaintiff had requested her personal assistance regarding perceived issues with the fairness of the

appeals process – "I was attempting to obtain any additional information that I could for you to

be sure that you had all the facts concerning your appeal and the process."  (Pl.'s Sur-Resp., Ex.

B.)  The National President's decision that she could no longer assist Plaintiff after Plaintiff

threatened legal action cannot reasonably be read as a refusal to provide Plaintiff with a third-

level appeal.

### 5. Summary of the Court's Findings

By way of summary, the Court finds the following undisputed facts:

1. Delta's definition of prohibited conduct regarding membership intake – anything not approved by Delta – is clear;

2. Delta's determination that Plaintiff engaged in prohibited conduct – by both exchanging emails with a prospective member regarding the intake process and participating in a "family" – was not erroneous; and

3. Plaintiff failed to show deficiencies in Delta's disciplinary procedures – inherent or as applied to her case – that warrant judicial intervention.

Under these circumstances, there is no basis for the Court to interfere with Delta's decision to

sanction Plaintiff and, therefore, her breach of fiduciary duty claim fails.

**C.    Plaintiff Provided No Evidence that Defendants Were Negligent.**

Negligence claims "require[] a showing of four elements":

1. "[T]he defendant had a duty to conform to a certain standard of conduct;"

2. "[T]he defendant breached that duty;"

3. "[S]uch breach caused the injury in question; and

4. "[T]he plaintiff incurred actual loss or damage."

Pyeritz v. Commonwealth of Pennsylvania, 32 A.3d 687, 692 (Pa. 2011) (citing Krentz v. Consol. Rail Corp., 910 A.2d 20, 27 (Pa. 2006)).  Plaintiff asserts that "Delta has a general duty of care to [its] members to not place them at risk of harm, both mental and physical," and that "Delta breached [this] duty . . . by failing to follow through with their own internal procedures . . . and by prematurely posting Plaintiff's suspension on their website," i.e. before she had completed the appeals process.  (Pl.'s Sur-Resp. at 10.)

Even assuming the existence of such a duty, Plaintiff cannot establish that Defendants breached it.  As discussed above, Delta did, in fact, follow its procedures when disciplining Plaintiff, and Plaintiff provided no basis for judicial interference in that process.  Furthermore, while Plaintiff may believe that Delta should allow its members to complete the appeals process before posting suspensions to its website, she provided nothing but her personal preference as the basis for such a requirement,[16] and it would be unreasonable for the Court to impose such a requirement in this case, because Delta disciplines its members only after investigations that provide them with an opportunity to present their cases.

---

[16] Delta's disciplinary procedures specifically provide that during the appeals process, "the decision made/action taken by elected/appointed officials of Delta . . . against the appellant will stand."  (Appeals Process, Policy, para. 3.)

18

### D.   Plaintiff Cannot Establish that Defendants Defamed Her Because Their Publication Was True.

Truth is a well-established, "absolute defense to defamation." Knit With v. Knitting Fever, Inc., Civil Action Nos. 08-4221, 08-4775, 2012 WL 3235108, at *7 (E.D. Pa. Aug. 8, 2012) (Buckwalter, J.) (citing Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 562 (E.D. Pa. 2000) (Reed, J.) (citing Schnabel v. Meredith, 107 A.2d 860 (Pa.1954))); accord Edmond v. Am. Educ. Servs., 823 F. Supp. 2d 28, 35 (D.D.C. 2011), aff'd, 483 F. App'x 576 (D.C. Cir. 2012).

The truth of the publication in this case, that Delta suspended and fined Plaintiff, cannot be gainsaid.  Plaintiff does not contest that she engaged in the conduct for which Delta disciplined her, Plaintiff's discipline was carried out in accordance with Delta's procedures, and Plaintiff failed to show any basis for judicial interference in that process.

## V.   Conclusion

Defendants' Motion for Summary Judgment is GRANTED.  An appropriate order follows.

O:\CIVIL 12\12-1364 Baker-Bey v. Delta Sigma Theta\12cv1364.Memo re Sum J.docx